IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| HY CITE CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> REGAL WARE, INC., and SALADMASTER, INC., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)    Case Number 10-cv-00168-wmc<br>)<br>)<br>)<br>)<br>) |

## BRIEF OF THE UNITED STATES
### DEFENDING THE CONSTITUTIONALITY OF 35 U.S.C. § 292

The United States of America, by its attorneys, John W. Vaudreuil,

United States Attorney for the Western District of Wisconsin, and Megan McDermott,

Assistant United States Attorney for said District, having exercised its right to intervene

to defend the constitutionality of a federal statute under 28 U.S.C. § 2403 and Fed. R.

Civ. P. 5.1(c), submits this brief defending the constitutionality of 35 U.S.C. § 292.

### INTRODUCTION

On March 29, 2010, Plaintiff Hy Cite Corporation ("Hy Cite") filed a

Complaint alleging, among other things, that Defendants Regal Ware, Inc. and

SaladMaster, Inc. (collectively "Defendants") had violated the False Marking Statute,

35 U.S.C. § 292. Dkt. 1. The *qui tam* provisions of Section 292, which were first enacted

in 1842, permit private persons (known as "relators") to file suit under Section 292 for

misuse of patent markings. The statute provides for a fine of "not more than $500 for

every such offense," 35 U.S.C. § 292(a), and states that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States." 35 U.S.C. § 292(b).

On April 20, 2010, Defendants filed a motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). Dkt. 7. Among other things, Defendants argue that Hy Cite lacks Article III standing to bring its claims because it has not alleged a cognizable injury that is fairly traceable to Defendants' actions. Dkt. 7, pp. 9-16. Defendants further argue that Section 292 is unconstitutional as applied to Regal Ware because the statute does not contain an adequate mechanism for government oversight and control of the litigation in violation of the Appointments Clause and Take Care Clause of Article II. Dkt. 7, pp. 16-20. For the reasons set out below, Defendants' constitutional attack on Section 292 should be rejected.

## ARGUMENT

A *qui tam* case is an unusual hybrid form of suit having significant characteristics of both a private and a public action. On the one hand, a *qui tam* relator is similar in substantial respects to a plaintiff in a private civil action. The relator does not hold a formal position within the United States Government. In his conduct of a *qui tam* case, a relator has a personal financial stake in the suit, as the premise behind the *qui tam* mechanism is that a relator will be motivated in substantial part by the desire to further his own private interests.

On the other hand, in other respects, a *qui tam* suit is properly regarded as public rather than private litigation. A *qui tam* complaint does not allege that a relator

2

was personally injured by the defendant's unlawful conduct; rather, the gravamen of a *qui tam* suit is an allegation of wrong done to the Federal Government. And, because the Government is generally entitled to substantial recovery in such actions, *qui tam* litigation can immensely benefit the United States financially and can also provide a deterrent to illegal conduct in the future.

The Supreme Court held in *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771-78 (2000), that *qui tam* relators suing under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, have standing to bring suit in federal courts under Article III of the Constitution because they have received a partial assignment of a chose in action by Congress.[1] The Court further explained that "[w]e are confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies." *Id.* at 774. This standing ruling in *Vermont Agency* should definitively resolve any question about the status of False Marking *qui tam* cases under Article III, and, as discussed below, its reasoning also strongly supports rejection of a broad constitutional attack against *qui tam* provisions under Article II.

In the United States' view, nothing in the Constitution prohibits Congress from using its legislative power to authorize private persons to sue for their own interests and to obtain a recovery that will be shared by a relator and the public Treasury. Moreover, the long pedigree of *qui tam* actions and the adoption of this

---

[1] This legislative partial assignment is made pursuant to Congress's power under the Property Clause of the Constitution (Art. IV, Sec. 3, cl. 2), which authorizes Congress to dispose of the interest of the United States in a chose in action. "The power of Congress to dispose of any kind of property belonging to the United States is vested in Congress without limitation." *Alabama v. Texas*, 347 U.S. 272, 273 (1954).

mechanism by the earliest Congresses and Presidents establishes that *qui tam* provisions are fully consistent with the Framers' conception of the constitutional separation of powers doctrine.

Accordingly, as explained in this brief, each of Defendants' constitutional challenges should be rejected. In Section A, the United States provides an overview of *qui tam* legislation and how the Supreme Court has addressed various historical challenges to the constitutionality of these statutes. Section B addresses Defendants' Article III challenge to the provision of Section 292 that authorizes "any person" to bring an action for false marking. In *Vermont Agency*, the Supreme Court held that a qui tam relator has standing to sue under the False Claims Act ("FCA"). Defendants attempt to distinguish the False Marking Statute, arguing that a *qui tam* relator relying solely on Section 292 lacks Article III standing. As explained below, it may not be necessary for this Court to reach this constitutional question in light of Hy Cite's further allegations of injury as a distributor of mismarked products and as a competitor in the same market. However, in the event this Court reaches the Article III challenge to Section 292, Defendants' arguments should be rejected.

In Section C, the United States addresses Defendants' argument that the *qui tam* provision in Section 292 violates the Take Care clause under Article II or otherwise runs afoul of the constitutional separation of powers doctrine. The thrust of Defendants' argument is that Section 292 is unconstitutional because it provides no express mechanism by which the Executive Branch can intervene in a suit or bring it to a close. Importantly, this is a facial challenge, given that the Government has not

4

attempted in any way to take over and dismiss or otherwise restrict or limit the relator's action in this case.  Thus, the only separation of powers issue posed here is whether a relator filing suit impermissibly impinges on the Executive's prosecutorial discretion.  A *qui tam* suit initiated by a relator pursuant to Section 292(b) could impinge on the Executive's constitutionally assigned functions only if the Constitution categorically forbids the *qui tam* mechanism or requires affirmative authorization from the Executive Branch before the suit can proceed.  Because the Constitution does neither, Defendants' facial challenge should be rejected.

Finally, in Section D, the United States explains that there is also no merit to Defendants' Article II Appointments Clause challenge to the *qui tam* provisions of Section 292.  Because *qui tam* relators are not "Officers of the United States," their selection is not governed by that clause.  Neither a relator nor the relator's attorney fills a government office or draws a government salary, and neither person needs to establish suitability for federal employment.  In their conduct of litigation under Section 292, relators are under no legal or ethical obligation to take direction from the Government, owe no duty of loyalty to the Government (or to the United States), and are not otherwise required to carry out any governmental responsibilities.  Therefore, these litigants are analogous to plaintiffs who invoke a private right of action under any other federal statute.  Their suits may serve to deter and punish violations of federal law, and thus assist in effectuating Congress's purposes, but these individuals are not thereby transformed into "Officers of the United States" covered by the Appointments Clause.

A.      **THE LONG HISTORY AND USE OF THE *QUI TAM* MECHANISM IN ENGLAND AND THE UNITED STATES CONFIRMS ITS CONSTITUTIONALITY**

The essence of the *qui tam* mechanism is that a private party may bring suit because of a wrong done to the sovereign, and is entitled to a share of the recovery if the action is successful. Blackstone explained that:

> these forfeitures created by statute are given at large, to any common informer; or, in other words, to any such person or persons as will sue for the same; and hence such actions are called popular actions, because they are given to the people in general.
>
> Sometimes one part is given to the king, to the poor, or to some public use, and the other part to the informer or prosecutor.  But if anyone hath begun action, no other person can pursue it * * *.

J.W. Ehrlich, *Ehrlich's Blackstone* 545 (1959).

Central to any constitutional analysis of *qui tam* provisions is the Supreme Court's observation that "[s]tatutes providing for actions by a common informer, who himself has no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government."  *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 541 n.4 (1943); *accord Marvin v. Trout*, 199 U.S. 212, 225 (1905).

In *Vermont Agency*, the Supreme Court explored the development of the *qui tam* mechanism in England, beginning around the end of the 13th century as a common law device, and soon becoming a standard enforcement mechanism in various statutory schemes.  529 U.S. at 774-76.  In a prior decision, *C.J. Hendrey Co. v. Moore*, 318 U.S. 133,

137-38 (1943), the Supreme Court had discussed the development in England of the use of *qui tam* procedures for seizures and forfeitures to the Crown of ships or articles used in violation of the law, whereby a *qui tam* relator brought a civil action and received a share of the forfeiture proceeds.  In that opinion, the Court cited and discussed several *qui tam* cases of this type decided by colonial and pre-Constitution courts in America. *Id.* at 145-48 (citing and discussing *Hammond qui tam v. Sloop Carolina*, a 1735 case in New York; six other New York *qui tam* cases between 1752 and 1772; and *Phile qui tam v. The Ship Anna,* a 1788 Pennsylvania case).

Thus, by the time the Constitution was adopted, statutes authorizing *qui tam* suits were well known in England for several hundred years and also had been utilized by the colonial legislatures.  *See* Note, *The History and Development of Qui Tam*, 1972 Wash. U. L.Q. 81, 83, 94-95.  Indeed, the legal careers of colonial attorneys such as Thomas Jefferson included prosecuting *qui tam* actions, and James Madison would have been quite familiar with these types of cases in Virginia as his older brother retained Thomas Jefferson to handle several.  *See* J. Shestack, *Thomas Jefferson:  Lawyer* (1993), pp. 18-22.

Significantly for the purposes of the case now before this Court, the Supreme Court in *Vermont Agency* found that "[*q*]*ui tam* actions appear to have been as prevalent in America as in England, at least in the period immediately before and after the framing of the Constitution."  *Id*. at 776.  As the Court noted, "immediately after the framing, the First Congress enacted a considerable number of informer statutes.  Like

their English counterparts, some of them provided both a bounty and an express cause of action; others provided a bounty only." *Id.* at 776-77 (footnotes omitted).

Qui tam actions were indisputably a routine feature of early federal legislation. The First Congress enacted several such statutes, and at least five of them hewed closely to the model described by Blackstone, and were like Section 292; *i.e.*, they provided for a division of any recovery between the informer and the Government, authorized the informer to file his own suit, and placed no restrictions on the class of persons who could serve as relators.[2]  *See Vermont Agency*, 529 U.S. at 777 n.6 (listing and describing such statutes).[3]

Subsequent early Congresses and Presidents continued to employ this remedial *qui tam* mechanism.[4]  *See* H. Krent, *Executive Control Over Criminal Law*

---

[2]  *See* Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 209 (census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129 (extending census provisions to Rhode Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (regulation of seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137-138 (trade with Indians); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 209 (duties on liquor).

[3]  In addition, under another provision in the Constitution, Congress provided for federal court jurisdiction in a manner that is similar to *qui tam* actions.  Pursuant to Congress's power to "grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water" (Art. I, Sec. 8, cl. 11), early Congresses authorized the President to commission private ships (privateers) to capture enemy vessels and vessels engaged in illegal trade with enemies.  Under the prize statutes, the captor could bring the captured vessel into the jurisdiction of the United States and file an *in rem* action against the ship in federal court.  If the vessel was condemned, the captor was entitled to the ship or its value.  *See, e.g., The Sally,* 12 U.S. (8 Cranch) 382, 384 (1814) (Story, J.); *see also The Nassau,* 71 U.S. (4 Wall.) 634, 640-642 (1866).  As with *qui tam* provisions, the premise of these prize statutes was that important public purposes could be furthered by enlisting the efforts of private persons through the offer of a bounty collected through an action in federal court.

[4]  *See* Act of February 20, 1792, ch. 7, § 25, 1 Stat. 239 (2d Cong.; Post Office); Act of March 1, 1793, ch. 19, § 12, 1 Stat. 331 (2d Cong.; trading with Indians); Act of March 22, 1794, ch. 11, § 4, 1 Stat. 349 (3d Cong.; foreign slave trade) (applied in *Adams, qui tam* v. *Woods,* 6 U.S. (2 Cranch) 336 (1805); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (4th Cong.; trading with Indians); Act of April 2, 1802, ch. 13, § 18, 2 Stat. 139, 145 (7th Cong.; trading with Indians); Act

*Enforcement: Some Lessons from History,* 38 Am. U. L. Rev. 275, 296-300 (1989) (describing early Congressional use of *qui tam* statutes, and their effect).  Indeed, a law enacted by the Second Congress broadly provided for the award of costs in *qui tam* cases.  *See* Act of May 8, 1792, ch. 36, § 5, 1 Stat. 277-78.  Thus, by the time of the Second Congress, the *qui tam* mechanism was already regarded as a sufficiently well-established feature of federal law to warrant a general statute governing costs in such suits.

This history shows that *qui tam* suits were a firmly entrenched aspect of American law by the time Section 292 was enacted in 1842.[5]  Section 292 has been used by *qui tam* relators in many reported decisions throughout the 168 years since its enactment.  The earliest reported *qui tam* case under Section 292 appears to be *Nichols v. Newell*, 18 F. Cas. 199 (C.C.D. Mass. 1853), and other reported decisions demonstrate its continued use.  *See, e.g., Winne v. Snow,* 19 F. 507 (D. N.Y. 1884); *London v. Everett H.*

---

of April 29, 1802, ch. 36, §§ 3-4, 2 Stat. 171, 172 (7th Cong.; copyright); Act of May 3, 1802, ch. 48, § 4, 2 stat. 189, 191 (7th Cong.; mail carriers); Act of March 26, 1804, ch. 38, § 10, 2 Stat. 283, 286 (8th Cong.; Louisiana slave trade); Act of March 2, 1807, ch. 22, § 3, 2 stat. 426 (9th Cong.; slave trade).

[5]  Section 292 predated the False Claims Act by 21 years, as that statute was enacted in 1863.  *See* Act of March 2, 1863 (12 Stat. 696).  *Vermont Agency* identified several additional *qui tam* statutes in existence in 2000 which had been enacted prior to 1900.  529 U.S. at 768 n.1 (discussing 25 U.S.C. § 201 (penalties for violation of laws protecting commercial interests of Native Americans); 18 U.S.C. § 962 (forfeitures of vessels privately armed against friendly nations); 46 U.S.C. § 723 (forfeiture of vessels taking undersea treasure from the Florida coast)).  *Vermont Agency* also identified 25 U.S.C. § 81 (providing cause of action and share of recovery for contracting with Native Americans in an unlawful manner) as being on the books at the time of the decision; however, the *qui tam* provisions of that statute were repealed when Section 81 was amended with the March 14, 2000 enactment of The Indian Tribal Economic Development and Contract Encouragement Act, Pub. L. 106-179.  Congress has also enacted *qui tam* statutes of more recent vintage which remain on the books.  *See, e.g.,* 26 U.S.C. § 7341 (forfeiture of sums paid for property sold to avoid tax); 17 U.S.C. § 1326 (penalty for false copyright marking).

*Dunbar Corp.* 179 F. 506 (1st Cir. 1910); *Sippit Cups, Inc. v. Michael's Creations, Inc.*, 180 F. Supp. 58 (E.D.N.Y. 1960); and *Brose v. Sears Roebuck & Co.*, 455 F.2d 763 (5th Cir. 1972).

Thus, *qui tam* provisions similar or identical to Section 292 were adopted and used on a regular basis by the legislatures and legal systems in England and the American colonies, and this practice was carried on extensively by the early United States Congresses immediately after the adoption of the Constitution. This practice confirms that Defendants' challenge to the validity of the *qui tam* mechanism in Section 292 must be rejected because the Supreme Court has used precisely this type of historical evidence in upholding statutes against constitutional attack.

## B.    A *QUI TAM* RELATOR UNDER SECTION 292(b) HAS STANDING

In their motion to dismiss, Defendants argue that Plaintiff lacks Article III standing for its claims under Section 292. Dkt. 7, pp. 9-16. Defendants point to a decision from the Southern District of New York holding that a violation of Section 292, standing alone, establishes only a sovereign injury to the United States and cannot be a basis for a *qui tam* relator's standing to sue under Article III. Dkt. 7, pp. 9-10 (citing *Stauffer v. Brooks Brothers, Inc.*, 615 F. Supp. 2d 248 (S.D.N.Y. 2009); *appeals docketed*, Nos. 09-1428, 09-1430, and 09-1453 (Fed. Cir., July 7 and 17, 2009)).[6] Defendants' argument raises constitutional questions that the Court may avoid by distinguishing *Stauffer*, in which the plaintiff rested on the allegation that the injury giving rise to

---

[6] The Federal Circuit held oral argument in this matter on August 3, 2010. *See* Federal Circuit Docket Summary for Appeal No. 2009-1428.

standing was the violation of Section 292. In contrast, Plaintiff in this case is not premising standing simply on its status as "any person" authorized to sue under Section 292, but also on its status as a distributor of Defendants' mismarked products and/or as a competitor in the same market. Dkt. 20, pp. 6-8. As Plaintiff has argued, under the circumstances it is irrelevant whether "any person" has standing to sue under Section 292, because Plaintiff has alleged the necessary injury in fact to have Article III standing regardless. *Id.*, pp. 3-6.

In the event this Court reaches the constitutional question of whether Section 292 violates Article III by giving "any person" the right to sue, the Court should reject Defendants' arguments that a *qui tam* relator lacks Article III standing. At the outset, the United States believes that the Supreme Court's decision in *Vermont Agency* is dispositive on Defendants' Article III challenge. As discussed above, the Supreme Court found that a *qui tam* relator under the False Claims Act has Article III standing to sue because he receives "a partial assignment of the Government's damages claim." 529 U.S. at 771-78. The Court first noted that it was "beyond doubt that the [relator's False Claims Act] complaint asserts an injury to the United States — both the injury to its sovereignty arising from violation of its laws . . . and the proprietary injury resulting from the alleged fraud." 529 U.S. at 771. The Court then reasoned that the False Claims Act effects a partial assignment of the Government's claim to the *qui tam* relator, and concluded "that the United States' injury in fact suffices to confer standing on [the relator]." 529 U.S. at 774. Moreover, the Court was "confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies," which it

then examined in some detail. 529 U.S. at 774-78. The Court found "this history well nigh conclusive with respect to the [standing] question," 529 U.S. at 777, and concluded that "[w]hen combined with the theoretical justification for relator standing discussed earlier, it leaves no room for doubt that a *qui tam* relator under the FCA has Article III standing." 529 U.S. at 778.

There is nothing in *Vermont Agency* that would indicate that its finding of Article III standing for "any person" who files suit under the *qui tam* provisions of the FCA would not apply equally to "any person" bringing suit pursuant to Subsection 292(b) of the False Marking Statute. Several courts addressing the applicability of *Vermont Agency* to Section 292 have concluded that there is no basis for distinguishing the Article III analysis. *See, e.g., Pequignot v. Solo Cup*, 640 F. Supp. 2d 714 (E.D. Va. 2009) (declining to adopt a distinction between financial injury and sovereign injury); *see also* order denying motion to dismiss in *Shizzle Pop, LLC v. Wham-O, Inc.*, Case No. CV 10-3491 (C.D. Cal. Aug. 2, 2010) at 3 (citing cases and agreeing with the "majority of district courts" that have applied the holding of *Vermont Agency* to Section 292 *qui tam* actions) (copy attached); transcript of oral decision in *Harrington v. CIBA Vision Corp.*, No. 3:08-cv-251 (W.D.N.C. May 22, 2009) at 117 (excerpts attached). However, Defendants point to a contrary decision concluding otherwise, *Stauffer v. Brooks Brothers, Inc., supra*. In *Stauffer*, the district court dismissed a Section 292 case for lack of standing because the plaintiff had failed to adequately allege an injury in fact.[7]

---

[7] The plaintiff's appeal is currently pending before the Federal Circuit and that court held oral argument on August 3, 2010. *See* Federal Circuit Docket Summary for Appeal No. 2009-1428.

As the United States has argued to the Federal Circuit, *Stauffer* was wrongly decided for at least five reasons. First, the district court attempted to distinguish *Vermont Agency* by referring to the United States' interests under the False Claims Act as "simply . . . proprietary." *Stauffer*, 615 F. Supp. 2d at 254. The district court viewed alleged violations of Section 292 as a sovereign injury, explaining that the Government's general interest in seeing its laws enforced was not in itself a concrete, assignable injury in fact for the purposes of Article III. But this distinction is faulty, because an individual commits a violation of the False Claims Act by submitting a false claim to the United States even when the Government suffer no financial or proprietary injury of any kind from that false claim. *See e.g., United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt Group, Inc.*, 400 F.3d 428, 446 (6th Cir. 2005) ("[R]ecovery under the FCA is not dependent upon the government's sustaining monetary damages") (citation omitted); *Bly-Magee v. California*, 236 F.3d 1014, 1017 (9th Cir. 2001) (plaintiff does not need to prove monetary harm to the government to state an FCA claim); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n.7 (4th Cir. 1999) (FCA contains no requirement that government actually suffer damages). Thus, the presence of a monetary injury is not a basis for distinguishing *Vermont Agency*.

Second, the district court misread *Vermont Agency* by stating that the Supreme Court determined that the required harm in False Claims Act cases "is simply 'the proprietary injury resulting from the alleged fraud,'" and interpreting that decision as requiring that the United States have "an injury to it or to the public stemming from the fraudulent or deceptive false marking. " *Stauffer*, 615 F. Supp. 2d at 254. The district

court therefore viewed *Vermont Agency* as contemplating two separate injuries, proprietary and sovereign, with only the proprietary injury sufficient to convey standing on a *qui tam* relator.  But the Supreme Court did not make this distinction, and instead held that a *qui tam* relator under the False Claims Act asserts an undifferentiated injury comprising both a sovereign and proprietary injuries:  "It is beyond doubt that the complaint asserts an injury to the United States - both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud."  *Vermont Agency*, 529 U.S. at 771.  Thus, *Vermont Agency* supports the proposition that either an economic or a sovereign injury to the United States can be partially assigned to a private relator to pursue in litigation, thereby providing the relator with standing under Article III.

Third, to the extent that the statutory assignment under Section 292 involves only a sovereign rather a proprietary injury to the Government, the history of *qui tam* statutes is replete with examples of private relators being empowered to bring suit where the Government has suffered no proprietary injury.  Indeed, most of the *qui tam* statutes cited by the Supreme Court in its historical discussion of those statutes involved no proprietary injury to the United States.  *See Vermont Agency*, 529 U.S. at 776-77, nn. 5-7 (citing more than 15 early *qui tam* statutes, many of which are noted in footnotes 3 and 5 above).

Fourth, the district court misapplied the analysis in *Federal Election Commission v. Akins* , 524 U.S. 11, 24 (1998), citing it for the proposition that it was "doubt[ful] that

14

the Government's interest in seeing its laws enforced could alone be an assignable, concrete injury in fact sufficient to establish a *qui tam* plaintiff's standing. " *Stauffer*, 615 F. Supp. 2d at 254, n.5. *Akins* is inapposite, as it does not involve a relator under a *qui tam* statute but rather an individual who was seeking to have the Federal Election Commission respond to his complaint about campaign violations.

The general analysis in *Akins* has no bearing on whether the Government can assert its sovereign right to see its laws obeyed and expressly assign this right to a relator in a *qui tam* statute. Yet the district court cited *Akins* for the proposition that Article III standing in a *qui tam* case requires that an injury be economic in nature and adversely impact an individual competitor in the same market, or some aspect of the United States' economy. *Stauffer*, 615 F. Supp. 2d at 254, n.5. The district court's application of *Akins* goes too far, as its theory calls into question whether the United States could itself bring an action in court to enforce the patent mismarking law without showing some economic injury.

Fifth, the district court's premise that Section 292 implicates a sovereign injury and interest alone is inaccurate. Section 292(b) provides for a monetary penalty, half to be paid to the relator and the other half to be paid to the United States. The monetary recovery in turn provides the relator with a proprietary interest in the claim as defined by Congress.

In short, as explained above in Section A, the *qui tam* method for achieving public goals was well known to the Framers of the Constitution and the Members of the first sessions of Congress, and was obviously viewed by them as fully consistent with

the new constitutional scheme they were creating.  It would have been quite odd for the individuals who had just spent immense effort molding a new governmental structure to have enacted immediately thereafter not simply one, but several statutes violating that very structure.  Yet the earliest federal legislators created various schemes under which *qui tam* relators could sue to vindicate the sovereign interests of the United States, and the use of statutes like these continues to this day.  The Supreme Court's decision in *Vermont Agency* was heavily influenced by the longstanding pedigree of *qui tam* actions within our constitutional system, and this long practice in our country gives meaning to the Article III case or controversy requirement in this case as well.

For these reasons, the United States asserts that pursuant to the *qui tam* provisions of Section 292, "any person" has Article III standing to sue.  Thus, in the event the Court concludes that Plaintiff has no greater standing to sue under Section 292 than any other *qui tam* relator, this Court should nonetheless reject Defendants' argument that Plaintiff lacks Article III standing.

## C.     THE *QUI TAM* MECHANISM IN SECTION 292 DOES NOT FACIALLY VIOLATE CONSTITUTIONAL SEPARATION OF POWERS PRINCIPLES

The Court's analysis in *Vermont Agency* is also highly significant with regard to Defendants' Article II challenge.  Although the Court expressed no view as to whether *qui tam* suits under the False Claims Act violate Article II, 529 U.S. at 778 n.8,[8]

---

[8] Justices Stevens and Souter dissented from the Court's ruling that the False Claims Act does not authorize *qui tam* actions against states as a statutory matter; these Justices accordingly would have reached the other constitutional questions and would have found that the historical evidence gathered by the majority "together with the evidence that private prosecutions were commonplace in the 19th century, is * * * sufficient to resolve the Article II question * * *."  529 U.S. at 800.

the same historical acceptance of *qui tam* provisions that the Supreme Court found

conclusive on the issue of Article III standing also establishes the facial constitutionality

of *qui tam* provisions under Article II.

Indeed, all three district courts to have considered the issue of whether the *qui*

*tam* provision of Section 292(b) violates Article II of the constitution have decisively

rejected the challenge to the statute's constitutionality.  *See Pequignot*, 640 F. Supp. 2d

714, affirmed 608 F.3d 1356 (Fed. Cir. 2010); order denying motion to dismiss in *Shizzle*

*Pop, LLC v. Wham-O, Inc.*, No. CV 10-3491 (C.D. Cal. Aug. 2, 2010) (copy attached);

transcript of oral decision denying motion to dismiss in *Harrington v. CIBA Vision Corp.*,

No. 3:08cv00251 (W.D.N.C. May 22, 2009) at 117-20 (excerpts attached).

In a decision addressing the Article II challenge directly, the full Fifth Circuit

in *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 752 (5th Cir. 2001) (*en banc*), found

that the historical analysis in *Vermont Agency* answered a challenge to *qui tam* provisions

under the separation of powers doctrine: "[W]e are persuaded that it is logically

inescapable that the same history that was conclusive on the Article III question in

[*Vermont Agency*] with respect to *qui tam* lawsuits initiated under the [False Claims Act]

is similarly conclusive with respect to the Article II question concerning this statute."

The Supreme Court's substantial reliance in *Vermont Agency* on the

longstanding history of *qui tam* provisions was consistent with the Court's many

decisions looking to precisely this type of evidence in resolving constitutional claims.

As the Court has instructed, legislation "passed by the First Congress assembled under

the Constitution, many of whose members had taken part in framing that instrument, *

17

* * is contemporaneous and weighty evidence of its true meaning." *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297 (1888). The Supreme Court "has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs acquiesced in for a long term of years, fixes the construction to be given its provisions." *Myers v. United States,* 272 U.S. 52, 175 (1926) (giving great weight in constitutional interpretation to the practices of the early Congresses); *accord Marsh v. Chambers,* 463 U.S. 783, 790 (1983); *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986).

There are obviously limits to the use of history alone in interpreting the Constitution. For example, the First Congress also passed the statute struck down by the Supreme Court in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803). But, in this instance, as demonstrated above, the historical evidence from long English practice, the American colonial experience, and the early sessions of Congress utilizing the *qui tam* mechanism is overwhelming.

Also critical for this Article II challenge is the related principle that the ways constitutional provisions have actually been applied and used during our Nation's history give those provisions definition. *See Mistretta v. United States,* 488 U.S. 361, 401 (1988) ("traditional ways of conducting government * * * give meaning to the constitution"); *The Pocket Veto Case,* 279 U.S. 655, 689 (1929) ("long settled and established practice is a consideration of great weight" in constitutional adjudication).

The many *qui tam* provisions passed by Congresses and signed by Presidents, as well as their application by the Supreme Court in numerous cases, have created an "established practice" concerning their validity. The Supreme Court has on numerous occasions enforced *qui tam* provisions over many decades without raising doubts about their constitutionality. *See, e.g., Marvin*, 199 U.S. at 225; *United States ex rel. Marcus*, 317 U.S. at 541; *United States v. Bornstein*, 423 U.S. 303, 309 (1976); *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997).[9] The Court has also stated that it views the utilization of *qui tam* mechanisms as a legislative option for Congress: "Whether proscribed conduct is to be visited by a criminal prosecution or by a *qui tam* action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice." *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441 (1957).

In sum, the *qui tam* method for achieving public goals was well known to the Framers of the Constitution and the Members of the first sessions of Congress, and was viewed by them as fully consistent with the new constitutional scheme they were

---

[9] The Supreme Court's decision in *United States ex rel. Marcus* did not deal with any constitutional challenges to the *qui tam* mechanism, but it is instructive for the purposes of the case at bar today. In *Marcus*, the Supreme Court addressed the United States' argument against recovery for a particular *qui tam* relator who had based his suit on the revelations in a criminal indictment. In particular, the Government argued that "effective law enforcement requires that control of litigation be left to the Attorney General." 317 U.S. at 547. While the Court rejected that argument because it was "addressed to the wrong forum," the Court noted that this type of policy argument could be adopted by Congress through amendment of the False Claims Act, but Congress had not done so. The underlying premise of the Court's ruling is that Congress has authority to choose to attack fraud against the United States through *qui tam* provisions if it so desires as a policy matter, and Congress can also determine the terms under which *qui tam* suits may proceed. The Court did not engage in any constitutional analysis because the Government did not argue that the Constitution limits to the Executive the right to initiate litigation on behalf of the United States.

creating. As noted above in Section B, it would have been quite odd for the individuals who had just spent immense effort molding a new governmental structure to have enacted immediately thereafter a score of statutes violating that very structure. There is no evidence that early Congresses and Presidents were troubled by the *qui tam* mechanism as a threat to the new system of government, and the Supreme Court has never given the slightest hint of a separation of powers problem. These considerations should be highly influential for this Court today.

Further, as discussed above, the validity of the *qui tam* mechanism is not simply supported by the fact that the earliest Congresses and Presidents followed the lengthy practice in England and in the American colonial experience, and frequently used that device in legislation. Rather, that validity is also established by the related, but separate fact that the employment of *qui tam* mechanisms by the earliest Congresses, as well as by Congress during the extreme crisis of the Civil War, and their enforcement by the Supreme Court in various cases over the decades itself provides meaning to the relevant constitutional principles. This point cannot be emphasized too strongly given that, in light of the Supreme Court's observation that "because law is an instrument of governance rather than a hymn to intellectual beauty, some consideration must be given to practicalities." *Newman-Green Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837 (1989).

As discussed previously, the Supreme Court's approach to the Article III standing issue makes clear that a relator does not sue as the United States, but instead sues as a private person, even though his suit helps accomplish public goals. Thus, a relator in no way violates the constitutional separation of powers doctrine by usurping

20

the authority of Executive Branch officers to litigate for the United States as part of the
President's responsibility to "take Care that the Laws be faithfully executed" (Art. II,
Sec. 3).

The Supreme Court has variously characterized the principles imposed by the
separation of powers doctrine.  *See generally Clinton v. Jones*, 520 U.S. 681, 699-703 (1997)
(compiling cases).  As the Court has explained, "the lines between the powers of the
three branches are not always neatly defined."  *Id.* at 701.  However, the separation of
powers doctrine prohibits one branch from aggrandizing itself at the expense of
another; and, even where, as here, such inter-branch aggrandizement is not present, the
separation of powers principle might still be violated if a congressional enactment
"disrupts the proper balance between the coordinate branches."  *Nixon v. Administrator
of General Services*, 433 U.S. 425, 443 (1977).  In making such a determination, "the proper
inquiry focuses on the extent to which it prevents the Executive Branch from
accomplishing its constitutionally assigned functions."  *Id.*

In this instance, in passing Section 292, Congress plainly was not aggrandizing
itself; this provision grants no power to the Legislative Branch.  Hence, the inquiry here
turns on whether, by permitting a relator to pursue an action, Section 292 impermissibly
impairs the Executive from accomplishing any constitutionally assigned functions.

Defendants' attack on Section 292 proceeds from the assumption that the
Constitution requires Congress to empower the Executive, and only the Executive, to
file and litigate civil suits to collect penalties for violations of federal law.  Dkt. 7,
pp. 16-20.  Defendants appear to assert that because this function is constitutionally

21

assigned exclusively to the Executive, Congress may not empower persons outside the

Executive Branch to bring such suits.  Each of these premises is mistaken.[10]

Federal law frequently permits private parties to file civil actions alleging

violations of federal law, even if governmental officials believe that no violation has

occurred, and such common provisions obviously raise no separation of powers

concerns.  In many federal statutes, such as Title VII of the Civil Rights Act (42 U.S.C.

§ 1983) and the Sherman Antitrust Act (15 U.S.C. §§ 9, 15), Congress has provided a

private right of action by which aggrieved parties may both vindicate their rights under

federal law and help achieve public objectives such as adherence to antidiscrimination

or antitrust laws.  The decision to afford a private right of action undoubtedly reflects

Congress's desire to ensure that individual victims are compensated for their own

losses.  In addition, however, these provisions vindicate a societal interest in deterring

and punishing violations of federal law by enlisting private individuals in the process

by which Congress attempts to ensure that persons abide by federal law.

---

[10] Several courts of appeals have rejected constitutional challenges to *qui tam* provisions in the context of the False Claims Act, although they have done so on varying theories.  As noted, after the Supreme Court's decision in *Vermont Agency*, the Court of Appeals for the Fifth Circuit, sitting *en banc*, found that the history of *qui tam* provisions was "conclusive with respect to the Article II question, [and] that history, although not the sole definitive argument supporting the view that the FCA's *qui tam* provisions do not violate Article II, is certainly a 'touchstone illuminating' their constitutionality."  *Riley v. St. Luke's Episcopal Hospital,* 252 F.3d 749, 752-53 (5th Cir. 2001) (*en banc*) (citations omitted).  The Court went on to examine the controls that the Government retains in FCA litigation, finding that the relator's "intrusion" in the Executive's Article II power was "comparatively modest."  252 F.3d at 757.  Other courts of appeals have primarily relied on the controls provided by the current version of the FCA over a relator's conduct of litigation.  *See United States ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 805-07 (10th Cir. 2002); *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743 (9th Cir. 1993), *cert. denied,* 510 U.S. 1140 (1994); *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148 (2nd Cir.), *cert. denied,* 508 U.S. 973 (1993).

Moreover, Congress may authorize remedies such as punitive damages to be awarded to private parties, even though they serve no compensatory function, but are instead designed entirely to advance the public interest in punishment and deterrence. *See, e.g., Smith v. Wade,* 461 U.S. 30, 51 (1983) (punitive damages may be awarded in suit under 42 U.S.C. § 1983 for "reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law"); *Memphis Community School District v. Stachura,* 477 U.S. 299, 306 n.9 (1986) ("[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior").[11]

In addition to these private rights of action, Congress has given the Executive Branch certain authority to enforce most or all of these statutes, and the mechanisms for enforcement include litigation that can in many respects parallel suits brought by private parties.  The fact that Congress has provided these alternative means of law enforcement does not raise separation of powers problems, even though the private causes of action may sometimes conflict with or even obstruct the preferred strategy of the Executive, including litigation strategy.  As these statutes demonstrate, the fact that a private person can pursue litigation to enforce federal statutes in no way violates the President's constitutionally assigned functions.  And that is so because, even assuming the Constitution requires that Congress provide the Executive with some means of enforcing laws against patent mismarking, the Constitution does not require Congress

---

[11]  For examples of federal statutes expressly authorizing the award of punitive damages, *see, e.g.,* 15 U.S.C. § 1691e(b); 25 U.S.C. § 305e(b); 45 U.S.C. § 711(j).

to establish litigation authority to be exercised by the Executive as the only means of carrying out the law. *See Riley*, 252 F.3d at 753 ("Although the [Take Care] Clause states that the Executive must "take Care that the Laws be faithfully executed," it does not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law"). Accordingly, Congress's decision to provide more than one mechanism of enforcement does not impinge on any function that the Constitution requires the Executive Branch exclusively to perform.

In other words, to say that a function must be performed by the Executive Branch if the Government is to perform it at all does not answer the question whether the Constitution requires that the function be performed exclusively by the Government. If the Constitution vested the responsibility for bringing a particular suit (*e.g.,* to enforce Title VII or the antitrust laws) exclusively in an official of the United States Government (as, for example, the Constitution vests the pardon power exclusively in the President), then serious constitutional questions would be raised by any Congressional attempt to vest part or all of that authority in private persons outside the Executive Branch. But the Constitution imposes no such requirement.

In analogous contexts, the Supreme Court has on occasion rejected arguments that Congress cannot authorize private persons to exercise power that would, if assigned exclusively to the Government, be carried out by Executive Branch officers. In *Currin v. Wallace*, 306 U.S. 1 (1939), the Supreme Court upheld a regulatory scheme governing agricultural marketing in which Congress provided authority for the Secretary of Agriculture to impose a regulatory regime on agricultural producers in

certain areas, but provided that the scheme would go into effect only if the requisite number of private growers voted for it to do so. *Accord United States v. Rock Royal Co-operative, Inc.*, 307 U.S. 533, 577 (1939). Earlier, the Supreme Court sustained against constitutional attacks legislative regimes through which Congress granted authority to private parties that would, if assigned to the United States, be performed by the Executive. Thus, the Supreme Court approved a statute assigning to a private railroad industry group the power to impose safety codes that were binding on the industry and private individuals. *St. Louis & Iron Mountain Rwy. v. Taylor*, 210 U.S. 281, 285-87 (1908). Similarly, the Court found that Congress could validly provide authority to groups of private miners to set binding rules governing mining claims. *Butte City Water Co. v. Baker*, 196 U.S. 119, 127 (1905); *accord Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568 (1985) (upholding statutory requirement that registrants under federal regulatory scheme submit compensation disputes to binding arbitration by non-government personnel with limited judicial review).

It is certainly true that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion," *Heckler v. Chaney,* 470 U.S. 821, 831 (1985), and a *qui tam* relator's suit in a case such as this can affect such prosecutorial discretion insofar as it may create a suit in a case the Attorney General has not decided to litigate. A prosecutorial discretion argument here, however, is misplaced.

The Judicial Branch cannot compel the Executive Branch to pursue an enforcement action that the Executive believes is unwarranted. *See United States* v. *Cox*,

25

342 F.2d 167, 171 (5th Cir. 1965) (*en banc*) ("[i]t follows, as an incident of the

constitutional separation of powers, that the courts are not free to interfere with the free

exercise of the discretionary powers of the attorneys of the United States in their control

over criminal prosecutions"), *cert. denied*, 381 U.S. 935 (1965); *Community for Creative

Non-Violence* v. *Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("[t]he power to decide when

to investigate, and when to prosecute, lies at the core of the Executive's duty to see to

the faithful execution of the laws"); *In re International Business Machines Corp.*, 687 F.2d

591, 602 (2nd Cir. 1982) ("[t]he district court's involvement in the executive branch's

decision to abandon litigation might impinge upon the doctrine of separation of

powers").  A *qui tam* relator, however, lacks any power to compel government officials

themselves to use federal resources to bring and pursue a Section 292 suit; the decision

whether to litigate such a case still rests with the Attorney General.

　　　　Significantly for this discussion, the Supreme Court in *Vermont Agency*

declined to rely on a theory that a *qui tam* relator has standing simply because he is the

"statutorily designated agent of the United States * * *."  529 U.S. at 772.  The Court

instead explained that it must find standing for a relator to keep a portion of the

recovery from a defendant in a *qui tam* action, and concluded that there is such standing

because of "the doctrine that the assignee of a claim has standing to assert the injury in

fact suffered by the assignor.  The [False Claims Act] can reasonably be regarded as

effecting a partial assignment of the Government's damages claim."  *Id.* at 773 (footnote

omitted).

This reasoning shows that a *qui tam* relator does not sue as the United States or as its statutorily designated agent.  Rather, a relator sues because a partial assignment has been made to him by Congress pursuant to the constitutional Property Clause, and he is thus not suing as the United States.  For this reason, his suit does not unconstitutionally interfere with the discretion of Executive Branch officers to decide whether to litigate as the United States.

In other words, for purposes of a proper separation of powers analysis, it is critical to recognize that, although a relator may sue for and in the name of the United States Government, he is not the Government itself, and is not a legal representative of the United States.  In particular, in litigation, a relator does not appear — and is not reasonably understood to appear — as the United States.  Although the judgment ultimately entered in a *qui tam* action may have preclusive effect in a subsequent suit brought by the United States, the relator's legal and factual representations (for example, in pleadings and at oral argument) are not those of the United States, may be contradicted by representations made by attorneys for the United States, and are not binding on the United States.  Thus, although Congress intended for *qui tam* suits to serve the Government's interests (both by bringing money into the Treasury and by deterring future unlawful conduct), the Supreme Court has recognized that the relator's primary purpose in filing the suit is to acquire money for himself.  *See Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997) ("As a class of plaintiffs, *qui tam* relators are different in kind than the Government.  They are motivated primarily by prospects of monetary reward rather than the public good").

This distinction is important because, unlike an official or attorney for the United States, neither the relator nor his attorney is legally or ethically required, in the conduct of the *qui tam* litigation, to subordinate the relator's interests to those of the United States in the event the two conflict.  Nor does the relator have an agency relationship with the Government, or with the United States.  In the litigation, the relator — like other private parties —  must deal with the Government as a third party, for example, in the context of discovery requests.  And, if choices in the litigation must be made relating to governmental privileges (*e.g.*, state secrets or executive privilege), those choices are for the Government of the United States alone, and not for a *qui tam* relator.  For this reason, this case is fundamentally different from *Morrison v. Olson*, 487 U.S. 654 (1988).  Because the prosecutor in that case was assigned the function of representing the United States itself in a criminal prosecution, Congress could not – at least not without raising the most serious separation of powers questions – have assigned that responsibility to a private party outside the Executive and not subject to Executive control.

Defendants' related argument that Hy Cite is impermissibly pursuing a criminal action is in error.  *See* Dkt. 30, pp. 10-11.  Although Section 292(a) certainly provides for criminal offenses, the suit authorized by Section 292(b) is civil in nature. *See Pequignot v. Solo Cup*, 608 F.3d 1356, 1363 (Fed. Cir. 2010) ("A qui tam action is civil in form, even though it arises under a criminal statute") (citing 16 James Wm. Moore et al., *Moore's Federal Practice* - Civil § 107(B)(2)); *Clontech Laboratories, Inc., v. Invitrogen Corp.*, 406 F.3d 1347, 1352 (Fed. Cir. 2005) ("The statute supplies a civil fine for false

marking of articles."); *cf. Filmon Process Corp. v. Spell-Right Corp.*, 404 F.2d 1351, 1355 (D.C. Cir. 1968) ("We agree with the judicial pronouncements that 35 U.S.C. § 292(b), while penal, is not a criminal statute.").  This fully comports with the analysis of the Supreme Court in *Stockwell v. United States*, 80 U.S. 531, 542-43 (1871) (in a case involving *qui tam* provisions of the Act of March 2, 1799, imposing duties on imported goods, explaining that the use of the terms "suits" and "to be sued for . . . manifestly contemplates civil actions."); *see also Helvering v. Mitchell*, 303 U.S. 391, 402 (1938) ("That Congress provided a distinctly civil procedure for the collection of the [penalty] indicates clearly that it intended a civil, not a criminal, sanction.").

Thus, the relator in a *qui tam* case, in contrast to the independent prosecutor at issue in *Morrison v. Olson*, pursues civil litigation, is not a government official, and does not represent the United States.  *See Riley*, 252 F.3d at 755.  Only the Executive, and not the relator, has the power to decide whether the United States will bring suit.  The fact that a relator sometimes files a *qui tam* action "in the name of the Government" (31 U.S.C. § 3730(b)(1)), is a procedural practice that in no way alters this analysis.  The use of the term "*ex rel.*" in itself distinguishes *qui tam* suits from actions that are truly brought by the United States Government.  That caption alerts all concerned to the fact that the suit is actually being carried on by a party other than the Government itself.  Habeas corpus actions brought by state prisoners in federal court, for instance, may be styled "*United States ex rel. [State Prisoner] v. [State Warden].*"  *See, e.g., United States ex rel. Jennings v. Ragen,* 358 U.S. 276 (1959); and cases cited in *Townsend v. Sain,* 372 U.S. 293, 310 & nn. 7 and 8 (1963).

The United States further notes that another statute permits private parties whose only relationship to the Federal Government is contractual to bring legal actions in the name of the United States. *See, e.g.*, The Miller Act, 40 U.S.C. § 270b(3)(A) (permitting suits by subcontractors against general contractors with the United States "in the name of the United States for the use of the person bringing the action."). Such legal actions, like the government contracts they enforce, serve the public interest even though the plaintiff is not actually litigating as a representative of the United States.

Hence, a *qui tam* relator is not interfering with the President's constitutionally assigned functions because the relator is not suing as the United States. And, although his successful suit benefits himself as well as the United States Treasury, in that sense (and in other relevant respects) a relator is no different from other private plaintiffs who sue under federal statutes on their own behalf, but simultaneously vindicate public purposes.

For these reasons, *qui tam* provisions do not prevent the Executive Branch from accomplishing its constitutionally assigned functions. And there is nothing in the Constitution that categorically forbids the use of the *qui tam* mechanism or requires affirmative authorization from the Executive Branch before the suit can go forward.

Defendants here have nevertheless hypothesized that the *qui tam* provisions of Section 292(b) might impermissibly intrude on the Executive's constitutional functions in a case in which the Executive wishes to intervene and take the litigation in a different direction, such as by dismissing it. The United States assumes for the purposes of this brief that the Constitution would require a court to recognize that the Executive has

authority to intervene in or terminate a *qui tam* action in order to uphold Section 292 or, at a minimum, that the absence of such authority would present additional constitutional considerations and raise constitutional doubts.  But the Government has not sought to exercise its authority to terminate this civil action, nor has it sought even to intervene on the merits of the plaintiff's claim under Section 292.[12]

The possibility that a substantial constitutional issue might be raised under hypothetical future facts is no reason to declare the statute invalid on its face, or as applied here.  If in the future the Government seeks to intervene on the merits of a suit brought under the *qui tam* provisions of Section 292 or to have such a suit terminated, a court might still avoid any constitutional difficulty by construing other relevant statutory and Federal Rule provisions to allow the government to achieve its objective without reaching the constitutional question.  But it is neither necessary nor appropriate for the Court in this case to try to resolve those hypothetical statutory and constitutional issues where the Government has not sought (and failed) to terminate

---

[12]  Although the United States has not attempted to participate in this civil action other than to intervene under Fed. R. Civ. P. 5.1 to defend the constitutionality of Section 292, the Government has the necessary tools to participate if it wishes by virtue of other applicable statutes and rules, which include: (1) the right to be notified of the filing of the *qui tam* complaint, 35 U.S.C. § 290; (2) the right to appear in the *qui tam* litigation, 28 U.S.C. §§ 517 and 518, and to intervene under Fed. R. Civ. P. 24(a)(2) if it appears that the relator cannot adequately represent the interests of the United States; and (3) the right to veto a settlement by the *qui tam* plaintiff in cases in which the United States has intervened as a party by withholding its consent to a voluntary dismissal.  Fed. R. Civ. P. 41(a)(1)(A)(ii). The Government also possesses additional rights that may be employed with court approval: (1) the right to intervene upon a showing that the Government's claim "shares with the main action a common question of law or fact," Fed R. Civ. P. 24(b); and (2) the right to a protective order staying the relator's discovery upon a showing that it would interfere with the Government's investigation or prosecution arising out of the same facts.  Fed R. Civ. P. 26(c). The applicability of those provisions to a *qui tam* action under Section 292 are not presently at issue in this case, however.

this Section 292 case or to intervene on the merits. This Court should not decide a constitutional question that is not before it; indeed, doing so is the precise opposite of the Supreme Court's admonition that the federal courts should rule on constitutional issues only when they absolutely must do so. *See Public Citizen v. United States Department of Justice*, 491 U.S. 440, 465-66 (1989).

Here, the only question presented is whether, consistent with the requirements of Article II, a private party may initiate a *qui tam* action without Executive Branch authorization or involvement. Because nothing in Article II categorically forecloses such a result, Section 292 is not unconstitutional on its face, nor is there any basis to conclude that it is unconstitutional as applied to the facts of this case. Accordingly, Defendants' constitutional challenge under Article II should be rejected.

**D.**  **QUI TAM PROVISIONS DO NOT VIOLATE THE APPOINTMENTS CLAUSE BECAUSE QUI TAM RELATORS ARE NOT "OFFICERS OF THE UNITED STATES"**

Defendants also argue that the *qui tam* provisions in Section 292 violate the Appointments Clause in Article II of the Constitution (Art. II, Sec. 2, Cl. 2). Defendants assert that *qui tam* relators function as "Officers of the United States," whose litigation of this suit pursuant to the statute violates that clause. Defendants' argument on this issue is mistaken, and the points made above demonstrate their error.

The Appointments Clause states that the President:

> shall nominate, and by and with the Advice and Consent
> of the Senate, shall appoint Ambassadors, other public
> Ministers and Consuls, Judges of the supreme Court, and

> all other Officers of the United States, whose
> Appointments are not herein otherwise provided for, and
> which shall be established by Law:  but the Congress may
> by Law vest the Appointment of such inferior Officers, as
> they think proper, in the President alone, in the Courts of
> Law, or in the Heads of Departments.

Congress has not, in the words of the Appointments Clause, "established by Law" a government "Office" of informer or relator under Section 292.  To the contrary, the statute simply states in relevant part that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States."  35 U.S.C. § 292(b).

Neither the relator nor his attorney is entitled to the benefits, or subject to the requirements, associated with offices of the United States.  These individuals do not, for example, draw a government salary, nor are they required to establish their fitness for public employment.  These considerations demonstrate that *qui tam* relators are not "Officers" within the meaning of the Appointments Clause; as used in that clause, the concept of "Officer" has always been understood to "embrace the ideas of tenure, duration, emolument, and duties."  *United States v. Hartwell,* 73 U.S. (6 Wall.) 385, 393 (1868).

Further, not every individual who exercises authority within a legal framework created by Congress is transformed into an "Officer" within the meaning of the Appointments Clause.  Instead, Supreme Court precedent establishes that the constitutional definition of an "Officer" encompasses, at a minimum, a continuing and formalized relationship of employment with the United States Government.  *See*

*Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) (merchant appraiser is not an "Officer" for

purposes of the Appointments Clause where his position is without tenure, duration,

continuing emolument, or continuous duties); *United States v. Germaine*, 99 U.S. 508,

511-12 (1878) (surgeon appointed by Commissioner of Pensions was not an "Officer of

the United States" where his duties were not continuing and permanent); *see also*

*Edmond v. United States,* 520 U.S. 651, 659 (1997) ("Advice and Consent" of Senate

provision in Appointments Clause serves to curb Executive abuses and "promote a

judicious choice of persons for filling the offices of the union" (quoting *The Federalist*

No. 76, at 386-87)).  There is simply no language in the Appointments Clause, elsewhere

in the Constitution, or in any apparent Supreme Court decision to support the

proposition that this clause further applies to persons who are not officers or agents of

the Government.

Insofar as the Appointments Clause is concerned, *qui tam* relators are

analogous to plaintiffs who invoke a private right of action under any other federal

statute.  As explained above in Section C, these individuals play an important role in

the enforcement of federal law and the effectuation of Congressional purposes, but are

not thereby transformed into Officers of the United States.

Moreover, state officials and private persons are often assigned responsibility

for the implementation of federal law, including the collection of money that is the

property of the United States.  For example, Social Security disability programs, as well

as AFDC and Medicaid, are state-administered pursuant to contracts or agreements that

obligate the responsible state officials to adhere to federal law.  Private employers are

required to deduct federal taxes from their employees' paychecks and to transfer the money to the Federal Government; gasoline retailers are given similar obligations with regard to the collection of federal gasoline taxes. These individuals play a significant role in the effectuation of federal statutory schemes, but their role is plainly not governed by the Appointments Clause.

Nothing in the Supreme Court's seminal Appointments Clause ruling in *Buckley v. Valeo*, 424 U.S. 1 (1976), is to the contrary. There, the Supreme Court stated that the function of the Federal Elections Commission in conducting civil litigation "may be discharged only by persons who are 'Officers of the United States' within the language of the [Appointments Clause]" 424 U.S. at 140. But *Buckley* in no way modified the long-settled principle that "Officers" are those who actually fill federal offices. Indeed, *Buckley* cites both *Germaine* and *Auffmordt* with approval. 424 U.S. at 125-26 & n.162. Moreover, in defining "Officers," the *Buckley* Court said that the term applies to "appointees" or "appointed officials" who exercise significant authority under federal law. *See, e.g.*, 424 U.S. at 131 ("Officers" are "all appointed officials exercising responsibility under the public laws.").

Thus, the opinion in *Buckley* means that, because the members of the Federal Elections Commission served in federal offices and conducted executive functions, they had to be appointed pursuant to the Appointments Clause. That is quite different from requiring private persons who sue for themselves and simultaneously provide a benefit for the United States to be Officers of the United States in office under the Appointments Clause.

Simply put, *qui tam* relators have none of the characteristics associated with "Officers of the United States." They hold no government office, they draw no government salary, and in their own conduct of litigation under Section 292, they are not supervised by the Executive Branch. Although *qui tam* relators can play a significant role in the enforcement of federal law, and their actions often redound to the benefit of the United States, the same is true of private actors in a variety of contexts, and these factors do not make them subject to the Appointments Clause.

Several courts of appeals have agreed, in the context of the False Claims Act, that *qui tam* relators are not covered by the Appointments Clause. The full Fifth Circuit in *Riley*, 252 F.3d at 757-58, accepted the reasoning described above, recognizing that *qui tam* relators are not subject to either the benefits or the requirements associated with offices of the United States, and are thus not within the scope of the Appointments Clause. *Accord United States ex rel. Kelly v. Boeing*, 9 F.3d 743, 758 (9th Cir. 1993). And, in *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041 (6th Cir. 1994), the Sixth Circuit concluded that the Appointments Clause is not applicable because a *qui tam* relator is not vested with any governmental power. The wording of the Appointments Clause fully supports this conclusion, and, again, there is no indication that the Framers of the Constitution believed that the use of *qui tam* relators to achieve the Government's objectives violated that clause.

**CONCLUSION**

For the foregoing reasons, Defendants' challenge to the constitutionality of

35 U.S.C. § 292 should be rejected.


Dated this 20th day of August, 2010.


Respectfully submitted,

JOHN W. VAUDREUIL
United States Attorney

By:

*/s/ Megan McDermott*
_____

MEGAN McDERMOTT
Assistant United States Attorney
P.O. Box 1585
Madison, Wisconsin  53701-1585
(608) 264-5158
TTY (608) 264-5006